All right, we'll hear first from Mr. Kingsbury. Good morning, your honors. May it please the court, Paul Kingsbury of Calcagny and Konefsky LLP for Plaintiff's Appellant's Al Rushaid Petroleum Company, which I'll refer to as ARPIC, and Al Rushaid Trading Company, which I'll refer to as ARTIC. The district court erred when it dismissed plaintiff's defendant was not a stranger to the relevant agreements. Under Florida law, an owner of a company may be a stranger to the contracts of its subsidiary when those contracts were entered into before an acquisition. And here the district court erred when it held as a matter of law that the plaintiffs had failed to allege tortious interference claim based on that basis. Second, the district court erred in dismissing plaintiff's appellant's tortious interference claims, even if a privilege applies on the basis that we did not allege malicious and intentional misconduct on the part of the defendant. In reaching that conclusion, the district court reversed the normal pleading standard that should have applied on a motion to dismiss and made inferences in favor of defendant. Third, the district court erred when it dismissed ARTIC's unjust enrichment claim against defendant. Under the notice pleading standard that applies to unjust enrichment claims, as well as really to express approval of pleading claims in the alternative, ARTIC's use of a disjunctive and or in the claim was not a valid basis for dismissal. And ask you just to rewind the tape to your first argument about the stranger, the strangeness, if you will. Does your whole argument really boil down to the timing question when it is that you measure stranger status? Because it seems like we've got law and even the Florida DCAs have law that say a parent typically is not a stranger to its subsidiaries agreements, even minor, more minor ownership interests wouldn't render someone a stranger. But your point is, well, you were a stranger at the time the agreement was inked. I don't really think I understand why that would be the rule. That seems really weird to me, like why you wouldn't measure it at the time of the breach, the alleged breach. Well, your honor, I think for tortious interference with contracts claim, unlike, for example, tortious interference with business relations claim, that contractual relationship is fixed at the time the contract is saying, but so that means like every company that succeeds another that buys another that merges into another is necessarily a stranger to pre existing contract that no, no, your honor, not at all. Here, we're dealing with a motion to dismiss. We haven't fully developed a factual record in this case. We're not saying every not at all saying that every parent is necessarily a stranger, but the problem is the complaint. The complaint alleges enough on its face that it seems pretty clear that the parent subsidiary involvement here would apply. Right. I mean, what what what is it about this complaint that you think takes it out of the non stranger category. If I may, I think we should start with the Florida law on this issue. And in particular, that's the Gossard against the DA case. That's the Florida Supreme Court from 1998. That's the authoritative statement of Florida law on tortious interference claims against parent corporations. And there's no way to square defendants argument that there's a per se rule that a parent is privileged to interfere with its subsidiaries contracts. With that case, I agree that, that there's, there's not a per se rule on it at least that's what Florida courts have paid lip service to, but the more recent cases that have come out. Seem to effectively apply, even though there's not a per se rule, it, it seems very difficult to be able to establish that a parent company, at least with this type of relationship. Just is not a non is not a stranger, right, to the entity that is allegedly the subject, I guess, in really in a relationship with a party that is alleging interference. I think Your Honor, the vast majority of those cases is not every single one of those cases dealing with the, I'll call it a per se rule, or even a less stringent standard that a parent may be held as a stranger were decided after a motion were decided in the phase of litigation past motion to submit. So either a jury trial had taken place or summary judgment there had been a fully developed record. And I think that's an entirely different situation than what we have here because why, why, what is it about this record that's missing. That is present in the 20 years of cases 25 years of cases, plus since Gossard. I should know Gossard is the Supreme Court of Florida and to the extent that I understand, but still, you know, I mean, it would be, it would be odd for all of the cases that come after it from all the different DCA is to have completely missed the boat on construing Gossard. But again, Your Honor, I'm not saying that they all completely missed the boat. I'm just saying that Gossard controls it was on certification from this court that this, the Florida Supreme Court wrote Gossard, and given different procedural standards, those cases are distinguishable. In other words, what is it about that's what I'm asking, right, what is it that's missing from the complaint here that we know in the cases that come after Gossard that allowed those courts to conclude that the parent was not a stranger. Well, I guess one good example would be in the Volvo era leasing case where there was a consultant that was heavily involved in the business relationship. Here, we've alleged our pick has alleged that Siemens interfered with dresser Rand's management of the contract directly by causing dresser and Arabia the joint venture to breach that agreement. To the extent that Siemens was involved and directed its subsidiary after the acquisition to breach that agreement, there was no other in non privileged involvement in the, in the contract, right so there was beyond Siemens direction to dresser and Arabia to violate to breach the agreement, there's no other significant conduct with respect to the specific instances of of torsion interference that we've alleged in the complaint. And in particular, there's no relationship when there's no relationship outside of the the torsion conduct that's alleged. I think that's, that's the point of distinction with those cases. Can I ask you one more time in question this this case that gets bandied about in the briefing bridge financial. So, in bridge financial the DCA says it's it's adopting the reasoning of a Georgia case but it says that the plaintiff there was admittedly a 10% owner in the company at the time the he allegedly interfered. Right. So why doesn't that suggest to me the commonsensical notion that you would measure strangeness at the time of the alleged interference, not at the time, the deal was inked. Well, does that make sense. Yes, it does your honor bridge was we believe wrongly decided again as I hate to unnecessarily be myself but I think to the extent that bridge can be interpreted in line with Florida law, it was, it was an incorrect statement of Florida law and Gossard controls. That's the first point and as your honor noted, it interpreted Georgia law which is different on this point. In terms of that bear holding that there's privileged. This case was decided post trial. There was a fully developed factual record, and yet the plaintiff was still as the court determined unable to establish the that the privilege didn't apply. And so that's a clear point of distinction with our case where we are still at the 12 v six stage we're still at the complaint. I take it you would also have us discard the other DCA cases that saying the same thing. For example, the Volvo case, you know the case I'm referring. Yes, your honor, where they affirmed the trial courts determination that a defendant company quote acted with a supervisory interest in how the relationship between the two companies was conducted. When it caused one company to stop payments to the other. Just looks to me when you look at these cases, and it makes such obvious common sense that you look at the time, the conduct occurred. What am I missing here. I think that what we're missing is the standard that applies at the complaint stage, as well as the question of whether the conduct can be privileged. We are not the plaintiffs are not taking the position that we're entitled judgment as a matter of law on this point. All we're saying is that we've alleged sufficient facts to survive emotion to dismiss. There, there should be a full development of the factual record, and if defendant can establish that a privilege applies. Then it may be entitled to judgment as a matter of law or it might prevail at a jury trial, but to pre term a pre terminate the case at this stage is improper and Volvo also was decided after jury trial, making it completely distinguishable from this case. Why don't you move your second piece which is, even if privileged. Thank you. Thank you. So moving on to the question of whether there was sufficient malice alleged. The district court erred in in construing the complaint. Fundamentally, it district section on this ignored paragraphs 15 and 27 and 127 excuse me of the amended complaint. And it also applied an erroneous standard. Help me with this, I read the pleading carefully the complaint I looked at 127 paragraph 135 and 136 and as I understand it that's at the heart of your allegation right. Yes. Is there any allegation there that Siemens made any false representation. I think paragraph 127 clearly alleges that Siemens dis deceived Saudi Aramco about our ongoing participation in the joint venture. And with respect to that's with respect to our pick and with respect to Arctic. We have the misleading comments about does it specify when the false statement was made, it does not, and that's whom the false statement was made, it does specify who to whom this the false it was made that's to Saudi Aramco. The complaint also makes clear that at a minimum, this was a continuing representation that had been made in the original in connection with the negotiation of the original corporate procurement agreement, and that. So our ongoing involvement was a lead was specifically represented to Saudi Aramco at that early stage, and our position is that Siemens can continued that misrepresent that representation which is true and made but deceptive not to correct it as well as affirmatively made representations about the other thing purely malicious and not coupled with any legitimate competitive economic interest, isn't there enough on that. Position on competitive economic interest the district court said our shot alleges in its First Amendment complaint that one of the purposes of Siemens acquisition of Dr. G was Siemens financial interest in benefiting from the joint venture specifically the ability for Siemens to reap the long term benefits of Dr. G service and repair revenues as well as the combination of the joint ventures unique ability to manufacture and service. What about that. Your Honor, these are these are business torts in connection with a business tour virtually everyone involved has some economic benefit. Our point is that the way Siemens went about that was improper and supported by improper means, based on false representations, as well as Mr they had no legitimate business motive. They had no legitimate business motive that a business motive, but they know legitimate business motive in the way they proceeded with respect to this agreement just so I'm clear. So if privileged, then you have to show, is it either pure malice or improper means, or both pure malice and improper means, it's either your honor it's either mal actual malice or improper means so just so I'm clear you could say. Okay, push comes to shove, maybe I lose on the no economic interest thing so it's not purely malicious but in any event this improper means thing and paragraph 127 gets me across the line. Yes, your honor. For purposes of motion dismiss. I see what about the dismissal of the unfair competition claim. Your Honor, I think we got short shrift from the district court on the unfair competition claim I think we clearly laid out in the eighth count that that we compete for the same pool of customers. One major customer Saudi Aramco. We allege that Saudi Aramco agreed to enter into the corporate procurement agreement, based on the understanding that we held a substantial ownership interests. We allege that that defendant effectively stripped us right of our right one of the things that said here is that pleading was a shotgun pleading was it not a shotgun pleading, at least to the extent it didn't separate out the claims for stealing trade secrets which really arises under statute and common law unfair competition, did you break them out separately and if the answer is you didn't. Why wouldn't that be a classic example of a shotgun pleading to points your honor first. The district court did not hold that this cat that this was a shotgun pleading. Originally the court had held that it was a shotgun pleading we corrected and the district court below specifically held that we had satisfied, I'm asking the question of whether it was a shotgun pleading to the extent that it failed to separate out these claims, that is to say, the claim for stealing trade secrets which is I see it arises under statute, and a common law unfair competition allegation. Didn't you jump to together a lump them in one place. And if the answer is yes, why wouldn't that be a shotgun pleading. Our response on that is that we think rule at to specifically allows us to plead alternative theories in a single count. And we would still have to set them out clearly in different paragraphs right. Yes, your honor I believe we did set them out in different paragraphs the question of whether they're embodied within the same count is I think what Judge Marcus was referring to. And again, I think under rule at to we are pleading was sufficient. Let me ask you I know you're over time will give you your full rebuttal and we're going to give Siemens extra time as well but let me ask you a question about the improper means. Can you explain to me how the misrepresentation that you talk about constituted improper interference. That is how did it cause a change to any of your clients contractual rights or relationships. Well, your honor it what it what it did is it allowed a continuity of the corporate procurement agreement, despite the fact that the original deal with Saudi Aramco hadn't been satisfied. So it allowed Siemens to cut us out of the equation, without effectively notifying Saudi Aramco that we were no longer involved, but that did was paired with the other acts of misconduct in which Siemens engaged in and which are all alleged in the complaint. What that did is it allowed Siemens to violate our contractual rights by cutting us out while continuing to benefit. If we submit that, for example, if they had just said right up front that we were no longer involved that that would have stymied their efforts to continue to profit with that ongoing misrepresentation to Saudi Aramco. All right, thank you. Thank you. All right. Mr. Cook. We're going to give you an extra five minutes because we took your friend on the other side of the aisle over by five minutes. Much appreciated your honor. Don't feel like you have to use it. You're welcome to I thought you might say that. Good morning may please the court. My name is Brendan cook and as you know I represent Siemens. I want to start by providing a little context here because this this case we stand here today. After 10 years of litigation embracing at least six lawsuits in various states, two or three of which are in Florida, a number of arbitrations and all of this stems from this. This long tenured relationship or series of relationships the trace back under two sets of contracts, if you will. I don't want to spend a lot of time on them, but as the court may be aware from reading the briefs, there are these agency agreements that involve one of the appellants the Al Rishi trading company. And then there's the second agreement this partnership agreement or business venture agreement entered into between one of the dresser and entities and the Al Rishi petroleum investment company. And as the court is aware, the crux of this case really turns on the stranger issue. I think nine out of the 11 counts in this case embrace the tortious interference claim and it was appropriate that we drove right into the stranger issue and the temporal aspects of that. As we just heard in the last few minutes appellants claim that straight Siemens is a stranger to the relevant contracts, since it did not have a relationship with the contracting parties at the time, those contracts were entered into. Let me ask this. Absolutely. I think the toughest questions for him, at least for my purposes, are about the stranger issue. I don't really buy that Siemens was a stranger here. I think that Siemens was not a stranger under the law and therefore was privileged. However, and I'm not really sure that I buy that any act of Siemens was purely malicious within the meaning of the law. But I do wonder about whether this paragraph 127 of the complaint sufficiently alleges a misrepresentation that would qualify as improper means. I think that's the tougher question for you from my perspective. So can you explain, like, even if we get through strangeness and we get through pure pure malice and now we're at improper means, why it is that paragraph 127 isn't good enough? I think that's a good question. And I would submit to the court here this morning that in that respect, the pleadings, as the district court properly observed, are general, vague and conclusory. Well, I'm not sure that's true about 127. I mean, I can I can read it to you word for word if you want me to. But you know what it says. It's a it's a pretty full bodied paragraph. It seems to me effectively to convey the notion that Siemens lied about Al-Rashid's continuing involvement when, in fact, it had frozen Al-Rashid out. Like, why isn't that enough? Well, I would submit that because it is a fraud claim under Rule 9B, and I refer to the Omnipole case, which suggests that the details, the who, when, where, why, et cetera, the details of the fraud claims. So what are we missing? Just so I'm clear, we've got we've definitely got the who. We've definitely got the where. We've got the why. Maybe we don't have the when. We don't have the when, and I'm not even sure because the nature of how the appellants have treated Siemens, they've used those terms in very loosely and conflated different Siemens entities and dresser and entities. I don't think we can really tell who and I don't think we can tell when. And I would submit to the court that even the what is vague, general and conclusory, if you will. Can we tell the what? I'm sorry. The what? The what was said? Who said what to whom? That was false. And I think we're missing. Do we know who makes the statement? Yes. Do we know what was said? That's allegedly false. Falsely representing to Aramco that our pick has been actively involved in the joint venture when, in fact, one Siemens Energy had purposely excluded our pick from all aspects of the joint venture. And to Siemens Energy has been fulfilling purchase orders issued under the CPA and other aforementioned contracts. That's the what? Right. Well, I don't and I would submit what purchase orders when what subject matter does that cover? When were those purchase orders? Seems like it's meant to cover all purchase orders. Well, I guess it's a debatable proposition, and I hear where you're coming from. But I would I would submit it as our briefing suggests that. And I think as the district court agreed, there's some information there. Is it enough? As we know, threadbare recitals and conclusory allegations under the Supreme Court case and Ashcroft just hardly feels threadbare and conclusory to me. I mean, I get it that we're in this netherland between rule eight and rule nine. But I mean, that's that's not kind of boilerplate nonsense and a complaint. It's what is not there is the when. Right. And I mean, I guess beauty is in the eye of the beholder, and that's a debatable proposition. But I think it has to be considered in the context. And the reason when is particularly relevant, I suppose you would argue, is because the what is stated at a pretty high order of abstraction. Well, and the when is important because it begs the question, then, of what entity was involved. Is this a merger transition from the dresser and entities to the Siemens entities in terms of the level of activities and the kind of activities that were undertaken? One of the things that I think has been misspoken or overstated is the is the nature of the alleged diversion of the business, because in terms of the unfair competition claim, it bears noting that the Al Rashid entities did not compete with Siemens. They were partners. There was a joint venture agreement. And in one sense, the Arctic Group was an agent. They weren't a competitor. And Arctic did not manufacture equipment. Arctic was a partner of forty nine point nine percent partner that deferred, largely speaking to the management of Siemens with respect to administration of that relationship, if you will. So this was dismissed without prejudice, right? That is correct. Your honor. OK, so, I mean. I suppose the plaintiff could have replied, right? Well, they did that twice, as you're aware. I mean, the first time the original complaint and then they were invited. First Amendment complaint. But given that it was dismissed without prejudice. Well, that's an interesting question because they have neither submitted at the court below in the district court. They've never requested an opportunity to replead and they have never raised that issue in the context of their appellate briefing here. I'm not sure there's much more to say. As I suggested, after three cases in Saudi Arabia, one in New York, two pleadings here and two arbitrations, they've laid it all out there. There's nothing more for them to say. Yeah, but I noticed with with considerable interest that the first amended complaint is dismissed without prejudice. Suggesting you could come back or they could come back and replead the fraud with more particularity. I know they never tried to. I mean, obviously, this is we're traveling on in one amendation already. I don't mean to be free to go back and replete it. Well, I would suggest that ship is sailed. I mean, they've had that opportunity. And at least from the current procedural standpoint, I would submit that the door has been shut and they would not be free to replete it. I don't think there was anything more for them to say, frankly. Let me rephrase my question or put it sharper. Suppose this court were to say, you're right. The failure in Paragraph 127. Is enough to justify the dismissal. They didn't tell the when and they stated the what pretty abstractly. The court was free to dump it on that grounds. Could they then go back to the district court and replete it or at least file an application with the district court to replete? And if I'm redundant, I apologize, but I think in theory they might have had that opportunity a couple of years ago. They could have filed a motion for. I accept all of that. My question is, if they went back to the district court and I said, OK, we could have done a better job. Here is a proposed amendation to the first amended complaint. It does a better job. It lays out Paragraph 127 in great detail. We seek leave to amend once again with the district court, be free to grant that. And if the answer is yes, what are we really fussing with here? Well, I would say no. I would say for the reasons I've already articulated that the district court would not have the authority or a procedural basis to do so at this. You just explain that. I mean, I get it that this thing's been going on a long time. Right. Right. Like a bummer. But like as a matter of law, in answer to Judge Marcus's question, why not? And I may just be missing something. Yeah. And I, you know, perhaps and I'll be honest and say maybe catching me a little flat footed on that because I did not anticipate I'd be answering some questions. On procedural nuances to that effect, I'm happy to follow up. But as I said before, I think that door is shut. And I would look at this from a broader, more holistic standpoint in terms of we've got three groups of claims in this case. Obviously, the tortious interference claims, the unfair competition claims, and then the unjust enrichment claims. So the reason I raise it is it strikes me that you're making a pretty good argument about why the district court ought not to allow them to amend again. Right. But that's different from saying the district court for good cause could not grant them that leave if they came back with a with a with a really clear statement of the who, the what, the when, the why. Right. And it's it's an excellent question. And I just can't get into the mind of the district court and suggest why the door was left open, at least way back when a few years ago. And it was dismissed without prejudice. And I can't answer why the appellant did not ostensibly take advantage of that opportunity. So those are I wish I had a better answer. Let me let me ask the question in a slightly different way. And you may not know the answer. But did the district court say anything or was there any illumination in argument about why she might have dismissed this without prejudice rather than just a dismissal, which would automatically have been with prejudice? That's no is the short answer. And there was no oral argument on this. It was by written submission. There was we're left to left to some degree to speculate in that respect, I suppose. So I wish I had more clarity for you on that point, because it's obviously of some concern. But that's the best I can do at this juncture. I would like to go back and touch briefly on because of the critical import of the stranger issue. I don't want to beat a dead horse, as they say in Texas, where I'm from. But obviously, there's a great deal of weight put on the Hyatt case by appellants, an unpublished opinion from the district court. And I think as the panel has pointed out in some of its inquiries, there are a number of cases on this panel as well familiar with the stranger issue, given the decisions that have been issued in that regard. But I would submit that reference to the bridge financial case, which was raised and that we cite and rely on Volvo, the Volvo case, and in particular, the Skytruck company, the Sikorsky aircraft. Those are three among many others that reject the notion that there is some absolute magic or point in time about when this supervisory interest or financial interest has to come into play. I think as Judge Newsom observed, it really doesn't make any sense to suggest that somebody coming in after the fact would not or would be deemed a stranger, especially in a situation like this where you pay about $6 billion to come in and purchase a company. You purchase that company, inclusive of all its assets and liabilities for that matter, et cetera, and you buy the right to run that company and to operate that company at the risk of stating the obvious. If the rule were such that the supervisory or financial interest must exist at the formation or execution of the contract, that would obviously mean that a company coming in like Siemens would always be deemed a stranger, regardless of the nature and extent of supervisory control or the financial interest that it might have. That would be untypical as well to its obligations, especially a large publicly traded company like that, to its investors, its shareholders, and employees. It doesn't make any sense. I think if Judge Newsom, if you didn't say that expressly, it seemed like you certainly implied that. I think another critical point here is, and I will be very brief on this, is the pleadings themselves. I think this is where, for lack of better description, the appellant shot themselves in the foot. There are a myriad number of instances in the pleadings, and I would refer to this document 39 at pages 2, 3, 24, 27, 40, and 42, all of which underscore various instances that demonstrate Siemens financial interest and its supervisory control over the business. It want this company to expand its product line and to accelerate entry into the Saudi Arabian market. It did so to maximize the profitability of the business held by the JV for its benefit, and these are not arguments I'm making. These are admissions and allegations in the pleadings. The appellants submit that Siemens bought Dressaran so that it would reap long-term benefits of service and repair revenues, and the beat goes on there. I think that issue certainly slants heavily in Siemens' favor, I would submit. We've talked a little bit about the malice and the improper means issue, so I don't want to belabor that. I would merely say that, again, the district court, I think, properly observed that these were instances, in many instances, where the allegations were just very vague and conclusory, no details that were provided, certainly none along the lines as are typically required in this instance. I would be remiss if I did not touch on, since it has been raised, the two other claims, unjust enrichment and the unfair competition. Again, in terms of unfair competition, and I may have already said this, again, Siemens, there's been no allegation of customer confusion, first and foremost, and that's one of the threshold elements. So no allegation in that, to the effect that ARPIC competed with its opponent for a common pool of customers, and as I said, they were a partner, if you will. ARPIC was an agent and ARPIC was a partner, so they were not competing, and in fact, there's no allegation in the pleadings to the effect that ARPIC manufactured any of the kind of equipment that Siemens did. So that is an apples and oranges issue there, if you will. And unjust enrichment, I'll just touch briefly on that, because I think as the district court pointed out, and I think opposing counsel alluded to, that the use of this and or provision, if you will, all of the allegations, Siemens Energy and or entities it acquired received benefits. Siemens and or entities it acquired retained the benefits. Well, you know, what does that mean? I mean, I think it means one of three things, right? It means either Siemens did it.  Both Siemens and its subs did it.  Or the subs did it. Well, and if the subs did it, the subs are signatories to the contracts, and the theory of unjust enrichment crashes and burns because they're signatories to the contract. What about one of the other two theories, Siemens did it or everybody did it? Well, and I think that's where the court said it's unclear exactly what theory of liability is being alleged. And it's incumbent on the appellants, ostensibly, to identify what entity is the beneficiary. It's not incumbent on us to guess what they mean. And it is at least plausible that one of the dresser and entities, and they were certainly the signatories on the agency agreements on the BBA. What about they're going to say he's going to say rule eight D. It says, you know, alternative theories of liability, it's good enough if one of them works. So and or, because I mean, I think you would acknowledge that if it's Siemens, right, and they're good to go, at least at the pleading stage. I don't know if I would agree in that respect, because, again, it gets back to the adequacy or specificity of the pleadings. I understand that's a gray area because we it still begs the question of, well, what were the benefits that received? I mean, again, it's so vague, so conclusory. They got some money somehow somewhere. Different motion to dismiss. I'll say that. Right. So but the motion that you made that and or we can't tell what's going on here, that that might not be a basis for dismissal. Right. And that's that's understood. And again, the word that jumps out to me is fuzzy here. And I know one of the things they at least inferentially raised in their briefing, if not the discussion here this morning, is the notion. Well, has this been dismissed too early? Isn't this something we should have saved for another day and fleshed out the record? Well, I would submit for what benefit? You know, for another two years of doing this, they've had their chances. I don't know that there. And by the way, this court is aware in the cases we've cited. Yes. In many instances like this, I believe it's the Gunder case, among others, maybe on the poll as well. Recognize that in most instances, these are carried forward for further exposition and maybe considered for first submission, either on summary judgment or a jury. But that is not an absolute rule. I mean, if if if as a matter of law, the pleadings are inadequate as a matter of law, there are other bars or obstacles. It is completely appropriate for the case to be dismissed. And I think the district court got it right here. And I would be remiss as I see my clock is burning down, even with my extra time. If I didn't point out to the court, this has sort of been overlooked that the the twelve B-6 response in opposition was struck by the district court for violation of page limits and other things. So in essence, as we stand here today, whatever it's worth, there is actually no opposition to Seaman's twelve B-6 motion to dismiss. That has been it is in the record. It is crystal clear, but it has been glossed over in the briefing to some extent, whatever that's worth. So I see my my time has been consumed. I appreciate the extra time the court provided me. And for obvious reasons, based on fact and law, we respectfully request that the the court affirm the dismissal of the case. Thank you for your time this morning. All right. Thank you, counsel. Mr. Kingsbury, you have two minutes. So let me ask you a question at the outset. With regard to the claim that you make regarding unfair competition, help me with that for a minute. The Hornbook law is clear. That you must allege three things. First, actual or direct competition between the litigants, second, that the defendant used deceptive and fraudulent conduct, such as the use of imitative devices or other unfair means. And third, and it's the third requirement that you have to plead that I want to ask you about. You must show or you must at least allege that the conduct caused customer confusion so that the respective buyers purchase the defendant's wares, quote, under the impression they are buying those of their rivals. That's pretty clear in Florida law. Did you in this case have any make any allegation of customer confusion? Yes. I ask you, because is there an allegation that Saudi Aramco was confused or that it thought it was dealing with our pick rather than Siemens? We certainly allege that our pick was misled into believing that it continued to deal with with our pick. In particular, I think that's most salient with respect to the service contracts allegation. As I mentioned earlier, Saudi Aramco had been under the impression, based on our agreement in the corporate procurement agreement, that the that that Al Rashid Petroleum was going to be involved in the corporate in providing and later servicing the contracts of the joint venture. We allege that Saudi Aramco was misled about that point. And so I think both with respect to the actual products that were sold, as well as the service agreement, there was an understanding that we would be involved in the operation and governance of the joint venture. And I think that's more than sufficient to establish a claim of customer confusion. We did not use the magic words customer confusion, but I submit and I don't think it's really debatable. That's not what's required under Florida law. We point to one specific customer who was misled about our involvement. I just have two other quick points on the court's questions about leave to replead. I do think Rule 15 would give us the opportunity to see leave to replead on remand. Well, if it were remanded. If there was a remand, yes, sure. I think that the appeal, particularly with respect to tortious interference claims involved a question of law, we take the position that Florida law is clear that a parent can be a stranger. I don't think until Gossard is overruled, federal court should follow any other guidance with respect to Florida law. But just to be clear, we're not saying that there's a per se rule. We're not saying that there's an automatic rule. We're primarily articulating position that emotion dismiss phase. We should have been given the benefit of the doubt.